IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

BELINDA NARD                                                                                    PLAINTIFF

VS.                                        Case No. 04-CV-4157

TYSON FOODS, INC.                                                                          DEFENDANT

### MEMORANDUM OPINION & ORDER

Before the Court is Defendant Tyson Foods, Inc.'s (hereinafter "Tyson Foods") Motion for Summary Judgment. (Doc. 7) Plaintiff Belinda Nard has responded. (Doc. 15) The Court finds the motion ripe for consideration.

### I. BACKGROUND

Belinda Nard was hired on April 9, 2001, as a production worker in Tyson Foods' Nashville, Arkansas poultry processing plant. She performed production work until September 16, 2002, when she successfully bid for a transfer to a Maintenance Mechanic position in the plant's maintenance department. She was assigned to oversee the service and maintenance of a nugget line on second shift. Nard's male counterparts on the nugget line were Sergio Travino, Carlos Hernandez, and David Upton. Nard's supervisor was Maintenance Manager Darrell Wilhite. When Nard started her job in September 2002, Wilhite told her he did not believe a woman was capable of performing the job and that he did not want Nard to complain to him about what men in the department said or did to her.

Tyson Foods' progressive discipline policy has three graduated levels of disciplinary action: a verbal warning, a counseling statement, and a serious counseling statement. The latter is the most severe disciplinary action an employee can receive short of discharge and it is accompanied by an automatic three-day suspension. The written disciplinary policy states that

any employee who receives two serious counseling statements within a twelve-month period will be discharged. The progressive discipline document distributed to all new hires at orientation explicitly states that violation of Tyson Foods' safety rules will result in disciplinary action up to and including discharge. When she was hired in April 2001, Nard received the basic lockout/tagout training given to all new employees during new hire orientation. Before she was allowed to work on equipment as a maintenance mechanic, Nard received additional training in lockout/tagout procedures. Sometimes the training consisted of watching videos and other times the maintenance mechanics just signed papers stating they had been trained.

Lockout/tagout is a set of specific protocols by which equipment is isolated from every possible source of energy or unexpected movement prior to performing preventative maintenance or repair. Every employee in the Nashville plant is required to follow Tyson Foods' safety procedures, including lockout/tagout procedures. Before doing any work on any equipment, Nard was required to de-energize it, isolate it from all sources of energy and movement, and place a lock and tag on the means to re-energize the equipment, such as an electrical switch.

On February 9, 2004, Nard was on her lunch break when she was summoned by Ann Carr, a production worker, to help another maintenance mechanic, David Upton, with a problem on his line. The shutdown of Upton's line had also caused Nard's line to shut down. Nard asked Upton what the problem was, but Upton did not respond. Upton was already working on the line when Nard arrived. Nard used a water hose to wash the area on which Upton was working. After the wash, Upton saw a wire was lodged in the machinery. Upton used channel lock pliers to pull the wire out and the wheel of the machine began to turn freely. A supervisor, Andree Potter saw what happened and told Upton he could have lost a finger. At some point, Upton had

2

locked down the line, but later unlocked the line. When he pulled the wire out, the line was unlocked. After Upton pulled out the wire, Nard was told she needed to replace a seal on the pump on her line. Nard locked down her line and changed the pump.

Nard was given a serious counseling statement and three-day suspension because of the February 9, 2004 incident. The disciplinary document stated, "Belinda was observed working on an ABC return pump without proper Lock Out Tag Out". (Doc. 8, Ex. 1, pp. 36, 45; Deposition Ex. 1; Ex. 5, pp. 13-14). The serious counseling statement is dated February 9, 2004, but it is not clear whether the decision to give Nard a serious counseling statement was reached on February 9, 2004 or three to four days later, when Nard told Wilhite she needed a day off to go to the Equal Employment Opportunity Commission office in Little Rock. Nard disputes that she violated lockout procedures and believes the discipline was carried out in a discriminatory manner. Nard refused to sign the serious counseling statement. Maintenance employees David Upton and William "Rob" Roberson, white males, were also given a serious counseling statements and three-day suspensions for their participation in the same incident. Roberson was actually suspended only after Nard complained that Roberson had, in fact, not been suspended for the same conduct for which she was suspended.

On February 23, 2004, Nard filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging she was subjected to "a hostile work environment, a difference in treatment, [and she was] harassed and intimidated in the form of being denied adequate training, assistance with problems, my name removed from the schedule, no name on my time card slot, and called derogatory and demeaning names by my supervisor and male coworkers". (Doc. 8, Ex. 1, pp. 95-96, dep. ex. 8). On her February 23, 2004, EEOC charge

Nard checked the boxes on the charge form indicating she believed she was discriminated against because of her race and sex, and that she was retaliated against. Nard received a right-to-sue letter on this charge on August 27, 2004.

Around July 7, 2004, training supervisor Lonnie Friend met with maintenance personnel in an apparent attempt to foster teamwork among the maintenance mechanics. Towards the end of the meeting, Nard asked Friend whether complaints from employees to supervisors would be kept confidential. Friend responded he would do his best to ensure complaints would not be leaked to other workers. After Friend's response, Waylon Roberts stated no one should complain about being trained or anything else because he and other workers had not been trained when they started as maintenance mechanics. Then Roberts, looked at Nard and stated he had only been trained to shoot "his AK-47 and his M-16," but "they won't let me do that here." (Doc. 16, Ex. A, p. 54-5). After Roberts' comment, Friend sent Nard out of the meeting and Nard left. Friend never said anything else to Nard about Roberts' comments. The next Monday, Nard filed a terroristic threatening charge against Roberts. Nard told Assistant Nashville Complex Human Resources Manager Carolyn Box about the charge, and Box told Nard Tyson Foods would investigate the charge.

Nard received a second serious counseling statement on July 15, 2004, based on a complaint from a male coworker that Nard had made inappropriate physical contact with him. On the evening of July 12, 2004, maintenance employee Ramiro Sanchez reported to the Nashville Human Resources Supervisor Tem Gunter that Nard had grabbed his rear while he was bent over working on a triangle machine, which automatically bags product as it comes off the production line. After speaking with Sanchez, Gunter called Carolyn Box, who returned to the

4

plant that evening to begin an immediate investigation.

Before Box arrived at the plant, Gunter interviewed triangle machine operator Laura McGhee. According to McGhee's statement to Gunter, she did not see any contact between Nard and Sanchez, but she did see Sanchez jump up quickly and turn to face Nard. According to McGhee, Nard then said to McGhee, "He touched my butt." (Doc. 8, Ex. 2, pp. 19-20, Ex. 3, ¶ 9, att. B, p. 70). When Box arrived at the plant, she and Gunter interviewed maintenance employee Mitchell Parson, who was working on the triangle machine with Sanchez. Parson told them he had observed Nard touch Sanchez on his rear with her open hand. Box and Gunter then interviewed Nard, who stated she had indeed been standing behind Sanchez while he was working on the triangle machine. Nard stated that Sanchez was initially squatted down working on the machine, that he stood up, backed up, and ran into her, brushing against her thighs. Sanchez patted his rear, which Nard said she took to mean, "kiss my butt."

The next day, July 13, 2004, Box met with Nard again and told her she was being suspended until July 15 pending a resolution of the matter. It is standard procedure at the Nashville plant to suspend an employee accused of inappropriate conduct while the investigation and resolution of the matter is ongoing. Box interviewed Sanchez on July 13, 2004, too. Sanchez told Box that he and Mitchell Parson were working on the triangle machine and that Nard was standing behind him. He told Box that while he was squatted down working on the machine, he felt someone grab his rear. He told Box he stood up, turned around and saw Nard standing there. Sanchez told Box he shook his finger at Nard, and Nard said, "You don't have what I need." (Doc. 8, Ex. 3, ¶ 8, att. B, p. 67).

After reviewing the statements of the witnesses, Box concluded that Nard had more likely

5

than not made inappropriate physical contact with Sanchez by touching his rear. Box then recommended to Nashville Complex Human Resources Manager Ken Young that Nard receive a serious counseling statement for this incident. This meant Nard would be discharged because it was her second serious counseling statement within 12 months. Box had not been involved in Nard's previous serious counseling statement. Young concurred with her recommendation. Box met with Nard on July 15, 2004, to inform her that witnesses had corroborated Sanchez's allegations and she was being given a second serious counseling statement and being discharged as a result. Nard was discharged effective July 15, 2004.

There is no indication on what date other incidents Nard testified about in her deposition occurred, but those incidents are summarized immediately below. Nard had complained to Box, Ken Young, the plant manager, and others about sexual and racial harassment, but none of the alleged instigators were suspended during an investigation into Nard's complaints. Male maintenance mechanics called Nard a bitch, nigger, whore and punta. They also took her tools, threw her tools away and broke into her locker. At least two other production workers witnessed Nard being harassed by Sergio Travino, Carlos Hernandez, and another worker named Romeros. The harassment witnessed included these three workers grabbing and hitting Nard's butt.

Nard reported two specific incidents to Box. Nard complained Berry Stark, a production worker, grabbed a wrench out of Nard's pocket and told her the wrench was not the only thing that he wanted out of her pants. Stark also told Nard that was the only time he could play with her butt and commented that Nard had big breasts. Nard found the comments and actions degrading and complained to Box. Stark admitted the action and comments to Box, but it is not clear whether Stark was suspended during Box's investigation. Stark did receive a serious

counseling statement. Tyson Foods did not discharge Stark because he had not received a serious counseling statement in the prior 12 months. Nard also reported a worker named Cameron threw money on the floor in front of her, grabbed Nard by her arms, tried to lick her face and asked her how much it would cost to buy her. Cameron was required to watch a video on sexual harassment, but there is no indication he was suspended or received a serious written counseling statement.

Either Box or Young told Nard if some of the complaining did not stop that someone would lose their job. Nard also called Tyson Foods' 1-800 telephone number to complain of harassment, but was told that those complaints would be handled at the plant. Also, Wilhite allowed some maintenance mechanics, specifically Eddie Pricks, to work on their days off to receive overtime. Wilhite did not allow Nard to work on her day off to receive overtime.

On August 23, 2004, Nard filed a second charge with the EEOC alleging Tyson Foods had discharged her in retaliation for "complaining of discriminatory practices and filing and EEOC charge." (Doc. 8, Ex. 1, pp. 103-04, dep. ex. 10). Nard pleaded in her complaint and testified in her deposition that she actually received the right-to-sue notice for her February 23, 2004, EEOC charge on August 27, 2004. The ninetieth day from August 27, 2004, was Thursday, November 25, 2004, which was Thanksgiving Day. The last day on which Nard could file a timely lawsuit based on the allegations in her February 23, 2004, EEOC charge was Friday, November 26, 2004. On November 23, 2004, Nard correctly addressed her complaint to the United States District Court Clerk for the Western District of Arkansas, Texarkana Division. The complaint, however, was delivered by the United States Postal Service to the Miller County, Arkansas Circuit Clerk on November 24, 2004. The Miller County Circuit Clerk called Nard's

attorney's office and informed him of the mistake. The Miller County Circuit Clerk apparently agreed to hand deliver the complaint to the federal clerk, but did not do so on November 24, 2004. November 25, 2004 was Thanksgiving Day and November 26, 2004 was a state holiday. Nard's complaint was eventually filed on Tuesday, November 30, 2004. Nard's complaint alleges discrimination based on sex and race and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. and 42 U.S.C. § 1981 and seeks compensatory and punitive damages, costs, and attorney fees. Nard has not yet been issued a right-to-sue notice on her August 23, 2004, EEOC charge.

Tyson Foods argues each of Nard's claims brought under Title VII arising out of events prior to her discharge is barred because [1] she failed to file suit within 90 days of receiving a right-to-sue letter or [2] she failed to exhaust her administrative remedies with respect to her discrimination and harassment claims based on events that occurred between February 23, 2004 and July 15, 2004, the date of her discharge. Tyson Foods then argues that Nard's retaliatory discharge claim under Title VII and her parallel retaliatory discharge and discrimination claim under 42 U.S.C. § 1981 fail because Tyson Foods had a legitimate, non-discriminatory reason for discharging her. Tyson Foods also argues Nard cannot present sufficient evidence from which a jury could reasonably find Tyson Foods was motivated to discharge her due to retaliatory or discriminatory intent. Nard argues the 90 day limitations period should be equitably tolled, that events from February 2004 through July 2004 were a course of ongoing conduct that did not require her to exhaust her administrative remedies, and that factual issues regarding her retaliatory discharge claim are in dispute. The Court will discuss each issue in turn.

## II. DISCUSSION

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Krenik v. County of Le Sueur*, 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 372 (8th Cir. 1987); *Niagra of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986).

The Court in *Scherr Const. Co. v. Greater Huron Development Corp.*, 700 F.2d 463, 465 (8th Cir. 1983)(quoting, *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981)(emphasis added), a case involving the entry of summary judgment, stated:

> [w]hen a motion for summary judgment is made and supported by affidavits, the party opposing the motion may not rest on the allegations in his pleadings but must resist the motion by setting forth *specific facts* that raise a genuine issue of fact for trial.

**A.      Title VII's 90 day limitations period should be tolled.**

A plaintiff must file suit under Title VII within 90 days of receiving a dismissal and notice of rights/right to sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1). The limitation

period of 90 days in which claimant has to file suit after receiving an EEOC right to sue letter for discrimination is not jurisdictional and is subject to equitable tolling. *Hill v. John Chezik Imports*, 869 F.2d 1122 (8th Cir. 1989). Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in her way. *Walker v. Norris*, 436 F.3d 1026 (8th Cir. 2006). The equitable tolling of the statute of limitations in employment discrimination cases is generally reserved to circumstances beyond the control of the litigant. *Hill*, 869 F.2d at 1124 (8th Cir. 1989).

First, the Court finds Nard has pursed her rights under Title VII diligently. She filed two charges of discrimination with the EEOC when she believed Tyson Foods took discriminatory action against her. Nard's second charge of discrimination is stilling pending with the EEOC, but she filed suit after she received her first right-to-sue letter. She has frequently complained about her treatment at the plant to supervisors and to corporate headquarters through Tyson Foods' 1-800 discrimination telephone number. Second, the Court finds the postal service's mis-delivery of her complaint to the wrong courthouse in Texarkana is an extraordinary circumstance that stood in the way of Nard timely filing her complaint. The Court finds Title VII's 90 day filing limitation period should be and hereby is tolled. The Court also finds Nard's complaint was timely filed.

**B.     Nard exhausted her administrative remedies with respect to events occurring between February 23, 2004 and July 15, 2004.**

Tyson Foods argues that because Nard only complained of retaliation in her August 23, 2004 charge of discrimination, she has not exhausted her administrative remedies for a claim for

race or sex discrimination based on events occurring between February 23, 2004, the date of her first EEOC charge, and July 15, 2004, the date she was discharged. Under Tyson Foods argument, neither the July 7, 2004 incident with Waylon Robison nor the incidents leading to Nard's second serious counseling statement could form the basis of any recovery for Nard. As stated above, the record is not clear when other acts of harassment that Nard complained of took place, so the Court does not know on what other events that occurred between February 23, 2004 and July 15, 2004 Nard could rely.

Tyson Foods focuses on the wrong charge of discrimination. In her first charge of discrimination filed February 23, 2004, Nard clearly complains of race and sex discrimination in the form of hostile work environment, disparate treatment, and harassment. Nard also complains of retaliation. For purposes of exhausting administrative remedies as required by Title VII, there is no requirement that subsequently-filed lawsuits mirror the administrative charges; however, the sweep of any subsequent judicial complaint may be only as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination. *Duncan v. Delta Consol. Industries, Inc.*, 371 F.3d 1020 (8th Cir. 2004); *see also Nichols v. American Nat. Ins. Co.*, 154 F.3d 875 (8th Cir. 1998) (holding the scope of subsequent civil suit is not necessarily limited to the specific allegations in the EEOC charge). The Court finds events occurring between February 23, 2004 and July 15, 2004 could reasonably be expected to grow out of Nard's February 23, 2004 charge of discrimination. Therefore, the Court finds Nard has exhausted her administrative remedies with respect to claims based on these events.

**C. Genuine issues of material fact exists as to whether Tyson Foods intentionally discriminated against Nard based on her race and/or sex and whether Tyson Foods impermissibly retaliated against her.**

Nard's Title VII and § 1981 claims for discrimination and retaliatory discharge should be assessed using the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). *See Johnson v. AT & T Corp.*, 422 F.3d 756 (8th Cir. 2005). To establish a *prima facie* case of retaliatory discharge, an employee must show (1) that she was engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496 (8th Cir. 2005). Tyson Foods concedes Nard can meet the first two elements, but argues Nard cannot show a causal connection between the protected activity and her discharge. To establish a *prima facie* case of discriminatory discharge under *McDonnell Douglas*, an employee must show (1) that she belongs to a protected class, (2) that she was qualified for her position, (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Johnson*, 422 F.3d at 761. Tyson Foods concedes Nard can meet the first three elements, but argues Nard cannot show her discharge occurred under circumstances giving rise to an inference of discrimination.

The Court believes Nard can show both of the disputed elements and, thus, can satisfy her *prima facie* case for retaliatory discharge and discrimination. When Tyson Foods issued Nard the first serious counseling statement, it failed to issue contemporaneous counseling statements to another white male worker, Rob Roberson, and a male supervisor, Andre Potter, who were also at the scene. Nard testified the serious counseling statement was issued at about the same time she told Wilhite she was going to travel to the EEOC office in Little Rock to lodge a

12

complaint against Tyson Foods. Roberson was only issued a serious counseling statement when Nard later complained she was being treated unfairly as compared to other maintenance mechanics involved in the incident. Tyson Foods did not issue Potter a serious counseling statement for the same incident. Wilhite, who warned Nard not to complain about her treatment from male maintenance mechanics and refused to allow her overtime while allowing male maintenance mechanic's overtime, participated in issuing Nard the serious counseling statement.

The second counseling statement concerning alleged sexual harassment by Nard directed towards Sanchez was issued in close proximity to the time Nard accused Waylon Roberson of threatening her in a meeting of maintenance mechanics. Tyson Foods treated Nard differently than it did some of the people whom Nard accused of sexual harassment. Nard was suspended during the course of the investigation. Nard previously complained about racial and sexual harassment from male co-workers but Tyson Foods did not suspend these male co-works during its investigation of Nard's complaints. In fact, the only investigation that appears to have occurred from Nard's extensive complaints was of Berry Stark. Nothing in the record indicates Berry Stark was suspended pending an outcome of the investigation. Also, when Nard complained of Cameron's sexual harassment, he was not issued a serious counseling statement. The record is not clear whether this was due to his denial of the incident or a lack of corroborating evidence. The Court has no hesitancy in finding Nard has established a causal connection between her complaints about racial and sexual harassment and either of the two serious counseling statements and that her discharge occurred in circumstances giving rise to an inference of discrimination.

Under the burden-shifting framework applicable to these claims, once an employee

13

demonstrates a *prima facie* case, the burden shifts to the employer to rebut the employee's *prima facie* case by articulating a legitimate, non-discriminatory reason for the employee's discharge, and if the employer makes this showing, the burden shifts back to the employee to show that the employer's proffered reason was a pretext. *Kasper*, 425 F.3d at 502. Assuming *arguendo* that Tyson Foods has established a legitimate, non-discriminatory reason for Nard's discharge (i.e. conformity with Tyson Foods' written disciplinary policy), the Court believes Nard can show Tyson Food's proffered reason was a pretext for racial and sexual discrimination. Wilhite, Nard's immediate boss, told Nard from her first day as a maintenance mechanic that he did not want her to complain about any hostile treatment from male maintenance mechanics. Such a statement shows Wilhite believed prior to Nard beginning her new position that Nard would face some hostile treatment from her co-maintenance mechanics. Yet, Wilhite's course of action was not to attempt to head off or correct any hostile treatment, but to have Nard deal with the hostile treatment on her own. Wilhite also denied Nard overtime while permitting male maintenance mechanic's overtime. Since Wilhite participated in issuing Nard her first serious counseling statement at around the same time Nard told Wilhite she was going to travel to the Little Rock EEOC office to complain about her treatment, the Court finds Nard can show pretext as to the first serious counseling statement. As mentioned above, Tyson Foods treated Nard differently than other workers it investigated for sexual harassment, workers about whom Nard complained, when it issued Nard her second serious counseling statement. This treatment plus the temporal proximity of the second serious counseling statement to Nard's complaints of Roberson's physical threats towards her allows the Court to find Nard can show pretext as the second serious counseling statement which lead to her discharge. The Court finds genuine issues of material

14

fact remain as to all of Nard's claims.

## III.  CONCLUSION

For reasons discussed herein and above, the Court finds Tyson Foods' Motion for Summary Judgment should be and hereby is **denied.**

IT IS SO ORDERED, this 5th day of April, 2006.

                                                    /s/ Harry F. Barnes
                                            Hon. Harry F. Barnes
                                            U.S. District Court